IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| STEPHEN CAVANAUGH, | |
| Plaintiff, | 4:14-CV-3183 |
| vs. | |
| RANDY BARTELT, et al., | MEMORANDUM AND ORDER |
| Defendants. | |

The plaintiff, Stephen Cavanaugh, is a prisoner in the Nebraska State Penitentiary. Cavanaugh says he is a "Pastafarian," *i.e.*, a believer in the divine "Flying Spaghetti Monster" who practices the religion of "FSMism." He is suing the defendants, who are all prison officials, because of their refusal to accommodate his religious requests. Filing 1. The defendants move to dismiss his claims. Filing 20.

The Court finds that FSMism is not a "religion" within the meaning of the relevant federal statutes and constitutional jurisprudence. It is, rather, a parody, intended to advance an argument about science, the evolution of life, and the place of religion in public education. Those are important issues, and FSMism contains a serious argument—but that does not mean that the trappings of the satire used to make that argument are entitled to protection as a "religion." Nor, the Court finds, has Cavanaugh sufficiently alleged how the exercise of his "religion" has been substantially burdened. The Court will grant the defendants' motion to dismiss.

## I. BACKGROUND

Cavanaugh's complaint actually contains very little detail on FSMism or its purported requirements—perhaps because the deliberate absurdity of its provisions would undermine his argument. So, before addressing Cavanaugh's specific allegations, it will be helpful to examine FSMism in more detail.

### 1. FSMISM

FSMism can only be understood in the context in which it arose: as a response to the theory that the origins of life on Earth can be found in "intelligent design." *See generally Kitzmiller v. Dover Area Sch. Dist.*, 400 F. Supp. 2d 707 (2005).

The religious movement known as Fundamentalism began in nineteenth century America as a response to social changes, new religious thought and Darwinism. Religiously motivated groups pushed state legislatures to adopt laws prohibiting public schools from teaching evolution, culminating in the Scopes "monkey trial" of 1925.

In 1968, a radical change occurred in the legal landscape when in *Epperson v. Arkansas*, the Supreme Court struck down Arkansas's statutory prohibition against teaching evolution. Religious proponents of evolution thereafter championed "balanced treatment" statutes requiring public-school teachers who taught evolution to devote equal time to teaching the biblical view of creation; however, courts realized this tactic to be another attempt to establish the Biblical version of the creation of man.

Fundamentalist opponents of evolution responded with a new tactic . . . which was ultimately found to be unconstitutional under the First Amendment, namely, to utilize scientific-sounding language to describe religious beliefs and then to require that schools teach the resulting "creation science" or "scientific creationism" as an alternative to evolution.

In *Edwards v. Aguillard*, . . . the Supreme Court held that a requirement that public schools teach "creation science" along with evolution violated the Establishment Clause. The import of *Edwards* is that the Supreme Court turned the proscription against teaching creation science in the public school system into a national prohibition.

*Kitzmiller*, 400 F. Supp. 2d at 711-12 (citations omitted). The concept of "intelligent design" was then promoted; generally described, it maintains that Earth's ecosystem displays complexity suggesting intelligent design by a "master intellect." *Id.* at 718. But unlike its predecessors, the "official position" of intelligent design is that the designer is not expressly identified as a deity. *Id.* at 718-19.

FSMism is a riposte to intelligent design that began with a letter to the Kansas State Board of Education when it was considering intelligent design. *See*, Bobby Henderson, *The Gospel of the Flying Spaghetti Monster* 111-13 (2006) (FSM Gospel). The primary criticism of intelligent design—and the basis for excluding it from school science classes—is that although it purports to be "scientific," it is actually "an interesting theological argument" but "not science." *Kitzmiller*, 400 F. Supp. 2d at 745-46. The conceit of FSMism is that, because intelligent design does not identify the designer, its "master

intellect" could just as easily be a "Flying Spaghetti Monster" as any Judeo-Christian deity—and, in fact, that there is as much scientific evidence for a Flying Spaghetti Monster as any other creator. *See* FSM Gospel at 3-4.[1] As the FSM Gospel explains, "[w]e are entering into an exciting time, when no longer will science be limited to natural explanations. . . . Propelled by popular opinion and local government, science is quickly becoming receptive to all logical theories, natural and supernatural alike." *Id.* at 11.

Consider the theory of Evolution. To their credit, Intelligent Design advocates have successfully argued that their alternative theory deserves as much attention as Evolution, since neither can be considered fact. This is a valid point, but Evolution is hardly the only theory in trouble.

It seems strange that Evolution is singled out as "just a theory" when there are so many basic ideas in science that remain unproven, yet are still taught as fact. The objections to teaching Evolution have only illustrated this point further: *Alternative theories must be taught in order to give our young students' minds a broad foundation.* The Intelligent Design proponents make a compelling, and totally legitimate, argument that if a theory has not been proven, then one suggested theory is just as good as another.

Take gravity, for example: the force of attraction between massive particles. We know a great deal about the properties of gravity, yet we know nothing about the cause of the force itself. Why are particles attracted to one other? If we review the literature, we find a lot of material dealing with the properties of gravity, but very little dealing with the underlying cause of this attraction. Until we have a proven answer to this question, it seems irresponsible to instruct students in what is, ultimately, just a theory. However, if we must discuss the theory of gravity at all, then it's reasonable that all suggested theories should be

---

[1] The Court has considered whether it is appropriate to consider this text, given the procedural posture of this case. But the Court finds that it is judicially noticeable—the contents of the book are capable of certain verification, see Fed. R. Evid. 201, and Cavanaugh's complaint expressly refers to the text as a basis for his claims. Filing 1 at 8. Given Cavanaugh's reliance on the book, the Court views judicial notice of it as effectively the same as taking judicial notice of the Bible. *See Nevius v. Africa Inland Mission Int'l,* 511 F. Supp. 2d 114, 119 (D.D.C. 2007). In fact, if the Court had not considered the text, Cavanaugh's claims would fail for a more mundane reason: he would not have stated a claim for relief because, from his complaint, it would be impossible to tell what he had actually asked for, or why, or anything about his purported beliefs other than their name.

given equal time, since none have been proven or disproven. Therefore, I formally submit that the Flying Spaghetti Monster is behind this strange and often misunderstood force.

What if it is He, pushing us down with His Noodly Appendages, that causes this force? He is invisible, remember, and is undetectable by current instruments, so in theory it is possible. And the fact that the gravitational powers of the Spaghetti Monster haven't been disproven makes it all the more likely to be true. We can only guess as to His motives, but it's logical to assume that if He is going to such trouble, there is a good reason. It could be that He doesn't want us floating off earth into space, or maybe just that He enjoys touching us—we may never know.

And while it's true that we don't have any empirical evidence to back up this theory, keep in mind the precedent set by Intelligent Design proponents. Not only is observable, repeatable evidence not required to get an alternative theory included in the curriculum, but simply poking holes in established theory may be enough. In this case, the established theory of gravity makes no mention as to the *cause* of the force; it merely presents the properties of it. I fully expect, then, that this FSM theory of gravity will be admitted into accepted science with a minimum of apparently unnecessary bureaucratic nonsense, including the peer-review process.

. . . .

No one is saying that the FSM theory of gravity is necessarily true, but at the very least, it's based on sound science, sound enough to be included in the curriculum with the other nonproven theories. Until the currently taught theory of gravity, known as Newtonism, is proven as fact, alternatives should be taught as well.

*Id.* at 3-5 (emphasis in original). FSMism is, then, a comedic extrapolation of the philosophical argument known as "Russell's Teapot": it rejects the idea that a hypothesis can be proved by an absence of evidence disproving it.[2]

---

[2] British philosopher Bertrand Russell wrote:

Many orthodox people speak as though it were the business of sceptics to disprove received dogmas rather than of dogmatists to prove them. This is, of course, a mistake. If I were to suggest that between the Earth and Mars there is a china teapot revolving about the sun in an elliptical orbit, nobody would be able to disprove my assertion provided I were careful to add that

But the FSM Gospel does not stop there: it sets forth—or, at least, follows the form of—a catechism of FSMism. *Id.*, *passim*. The blurb on back of the FSM Gospel conveys the flavor:

> Can I get a "Ramen" from the congregation?!
> Behold the Church of the Flying Spaghetti Monster (FSM), today's fastest-growing carbohydrate-based religion. According to church founder Bobby Henderson, the universe and all life within it were created by a mystical and divine being: the Flying Spaghetti Monster. What drives the FSM's devout followers, aka Pastafarians? Some say it's the assuring touch from the FSM's Noodly Appendage. There are those who love the worship service, which is conducted in Pirate-Speak and attended by congregants in dashing buccaneer garb. Still others are drawn to the Church's flimsy moral standards, religious holidays *every* Friday, and the fact that Pastafarian Heaven is *way* cooler. Does *your* Heaven have a Stripper Factory and a Beer Volcano? Intelligent Design has finally met its match—and it has nothing to do with apes or the Olive Garden of Eden.
>
> Within these pages, Bobby Henderson outlines the true facts—dispelling such malicious myths as Evolution ("only a theory"), science ("only a lot of theories"), and whether we're really descended from apes (fact: Humans share 95 percent of their DNA with chimpanzees, but they share 99.9 percent with Pirates!).

## 2. CAVANAUGH'S CLAIMS

Cavanaugh alleges that he is a Pastafarian: that he has "openly declared his beliefs for many years" and "has several tattoos proclaiming his faith." Filing 1 at 8. He began requesting that prison officials afford his "faith" the same rights and privileges as religious groups, including "the ability to order and wear religious clothing and pendants, the right to meet

---

the teapot is too small to be revealed even by our most powerful telescopes. But if I were to go on to say that, since my assertion cannot be disproved, it is intolerable presumption on the part of human reason to doubt it, I should rightly be thought to be talking nonsense.

Bertrand Russell, *The Collected Papers of Bertrand Russell, Vol. 11: Last Philosophical Testament* 547-48 (John G. Slater, ed., Routledge 1997) (1952).

for weekly worship services and classes and the right to receive communion."[3] Filing 1 at 8. His requests were rejected, because prison officials determined that FSMism was a parody religion. Filing 1 at 8-9. Cavanaugh says he was insulted by this conclusion. Filing 1 at 8. He has sued several prison officials in their official and individual capacities, pursuant to 42 U.S.C. § 1983, seeking injunctive relief and money damages. *See*, filing 1; filing 10; filing 11.

Cavanaugh's complaint invokes the religious freedom provisions of the First Amendment to the U.S. Constitution and art I, § 4 of the Nebraska constitution, as well as the Equal Protection provisions of the U.S. Constitution and art. I, § 3 of the Nebraska constitution. Filing 1 at 9-10. And the Court has also construed Cavanaugh's complaint as raising a claim under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc *et seq*. Filing 8.

## II. STANDARD OF REVIEW

A complaint must set forth a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). This standard does not require detailed factual allegations, but it demands more than an unadorned accusation. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint need not contain detailed factual allegations, but must provide more than labels and conclusions; and a formulaic recitation of the elements of a cause of action will not suffice. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). For the purposes of a motion to dismiss a court must take all of the factual allegations in the complaint as true, but is not bound to accept as true a legal conclusion couched as a factual allegation. *Id.*

And to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must also contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Iqbal,* 556 U.S. at 678. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* Determining whether a complaint states a plausible claim for relief will require the reviewing court to draw on its judicial experience and common sense. *Id.* at 679. The facts alleged must raise a reasonable expectation that discovery will reveal evidence to substantiate the necessary elements of the plaintiff's claim. *See Twombly,* 550 U.S. at 545. The court must assume the truth of the plaintiff's factual allegations, and a well-pleaded complaint may proceed, even if it strikes a

---

[3] Although Cavanaugh does not explain this in detail, it is clear from the FSM Gospel that "religious clothing" means a pirate costume and "communion" is, not surprisingly, "a large portion of spaghetti and meatballs." FSM Gospel at 38, 160.

savvy judge that actual proof of those facts is improbable, and that recovery is very remote and unlikely. *Id.* at 556.

## III. DISCUSSION

The Court will begin with RLUIPA, because its protections are broader than those of the Constitution, and the resulting analysis will provide the basis for addressing Cavanaugh's other claims. *See Van Wyhe v. Reisch*, 581 F.3d 639, 658 (8th Cir. 2009).

### 1. RLUIPA

RLUIPA provides that in a program that receives federal financial assistance,[4]

> [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>> (1) is in furtherance of a compelling governmental interest; and
>> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). A "'religious exercise' includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). The statute is to be "construed in favor of a broad protection of religious exercise, to the maximum extent" permitted by the statute and the Constitution. 42 U.S.C. § 2000cc-3(g).

But, of course, a prisoner's request for an accommodation must be sincerely based on a religious belief and not some other motivation. *Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015). In other words, the prisoner must show that the government's conduct "imposes (1) a substantial burden (2) on a *religious* exercise." *Native Am. Council of Tribes v. Weber*, 750 F.3d 742, 749 (8th Cir. 2014) (emphasis in original). And those are two discrete burdens, *see id.*, that the Court will consider separately.

### (a) Religious Exercise

Courts must not presume to determine the plausibility of a religious claim. *See Burwell v. Hobby Lobby Stores, Inc.,* 134 S. Ct. 2751, 2778 (2014).

---

[4] Every State accepts federal funding for state prisons. *Cutter v. Wilkinson*, 544 U.S. 709, 716 n.4 (2005).

Prison officials may, however, appropriately question whether a prisoner's religiosity, asserted as the basis for a requested accommodation, is authentic. *Cutter*, 544 U.S. at 725 n.13. Although RLUIPA bars inquiry into whether a particular belief or practice is central to a prisoner's religion, it does not preclude inquiry into the sincerity of a prisoner's professed religiosity. *Id.* The "truth" of a belief is not open to question; rather, the question is whether the objector's beliefs are truly held. *Id.*; *see Burwell*, 134 S. Ct. at 2779.

But that principle must have a limit, as courts have found when confronted with cultural beliefs; secular philosophies such as scientism, evolutionism, and objectivism; and institutions like the "Church of Cognizance" or "Church of Marijuana." *See, e.g., Daniel Chapter One v. Fed. Trade Comm'n*, 405 F. App'x 505, 506 (D.C. Cir. 2010); *Peloza v. Capistrano Unified Sch. Dist.*, 37 F.3d 517, 521 (9th Cir. 1994); *United States v. Zielinski*, No. 1:11-cr-533, 2013 WL 2636104, at *13-15 (N.D.N.Y. June 11, 2013); *Harrison v. Watts*, 609 F. Supp. 2d 561, 572-73 (E.D. Va. 2009); *United States v. Quaintance*, 471 F. Supp. 2d 1153, 1161 (D.N.M. 2006), *aff'd*, 608 F.3d 717 (10th Cir. 2010); *United States v. Meyers*, 906 F. Supp. 1494, 1508 (D. Wyo. 1995); *aff'd*, 95 F.3d 1475 (10th Cir. 1996). "Because RLUIPA is a guarantor of sincerely held religious beliefs, it may not be invoked simply to protect any 'way of life, however virtuous and admirable, if it is based on purely secular considerations.'" *Koger v. Bryan*, 523 F.3d 789, 797 (7th Cir. 2008) (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972)). And "'an asserted belief might be so bizarre, so clearly non-religious in motivation, as not to be entitled to protection.'" *Zielinski*, 2013 WL 2636104, at *13 (quoting *Frazee v. Ill. Dep't of Emp't Sec.*, 489 U.S. 829, 834 n.2 (1989)). In such instances, the initial inquiry is whether the belief at issue is genuinely "religious."

The Court is well-aware of the risks of such an endeavor: it might be too restrictive, and unduly exclusive of new religions that do not fit the criteria derived from known religious beliefs. *See Meyers*, 906 F. Supp. at 1509. But that risk is inherent in the statute (and for that matter in the First Amendment): RLUIPA's scope is defined in terms of "religious" belief, so the term must have meaning. *See Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 209 (1997) (statutes must be interpreted, if possible, to give each word some operative effect).

Courts have taken different approaches to such inquiries. However, the Court can start with these indicia:

> First, a religion addresses fundamental and ultimate questions having to do with deep and imponderable matters. Second, a religion is comprehensive in nature; it consists of a belief-system

as opposed to an isolated teaching. Third, a religion often can be recognized by the presence of certain formal and external signs.

*Love v. Reed*, 216 F.3d 682, 687 (8th Cir. 2000) (quoting *Africa v. Pennsylvania*, 662 F.2d 1025, 1032 (3rd Cir. 1981)); *accord Meyers*, 95 F.3d at 1483. Such "deep and imponderable matters" may include existential matters, such as humankind's sense of being; teleological matters, such as humankind's purpose in life; and cosmological matters, such as humankind's place in the universe. *Meyers*, 95 F.3d at 1483; *accord Quaintance*, 471 F. Supp. 2d at 1156; *see also Zielinski*, 2013 WL 2636104, at *13 (citing *Patrick v. LeFevre*, 745 F.2d 153, 158 (2d Cir. 1984)). But that is not a rigid test for defining a religion, and flexibility and careful consideration of each belief system are needed. *Love*, 216 F.3d at 687.

This case is difficult because FSMism, as a parody, is designed to look very much like a religion. Candidly, propositions from existing caselaw are not particularly well-suited for such a situation, because they developed to address more *ad hoc* creeds, not a comprehensive but plainly satirical doctrine. Nonetheless, it is evident to the Court that FSMism is not a belief system addressing "deep and imponderable" matters: it is, as explained above, a satirical rejoinder to a certain strain of religious argument. Nor, however, does FSMism advocate for humanism or atheism, which the Court acknowledges have been found to be "religious" for similar purposes. *See*, *Kaufman v. McCaughtry*, 419 F.3d 678, 681-82 (7th Cir. 2005); *Jackson v. Crawford*, No. 12-4018, 2015 WL 506233, at *7 (W.D. Mo. Feb. 6, 2015); *Am. Humanist Ass'n v. United States*, 63 F. Supp. 3d 1274, 1283 (D. Or. 2014). Those belief systems, although not theistic, still deal with issues of "ultimate concern" and take a position "on religion, the existence and importance of a supreme being, and a code of ethics." *See Kaufman*, 419 F.3d at 681-82 (quotations omitted). FSMism takes no such position: the only position it takes is that others' religious beliefs should not be presented as "science." Despite touching upon religion, that is a secular argument.[5] "[W]hile the belief in a divine creator of the universe is a religious belief, the scientific theory that higher forms of life evolved from lower forms is not." *Peloza*, 37 F.3d at 521 (citing *Edwards v. Aguillard*, 482 U.S. 578 (1987)).

It is not clear from Cavanaugh's complaint whether his professed adherence to FSMism is grounded in that argument, or in a literal reading of the FSM Gospel. But to read the FSM Gospel literally would be to

---

[5] The Court recognizes that secular and religious beliefs may overlap, and that religious beliefs are still entitled to protection where the secular and religious coincide. See *Meyers, 906 F. Supp. at 1508*. This is not such a case.

misrepresent it—and, indeed, to do it a disservice in the process. That would present the FSM Gospel as precisely the sort of Fundamentalist dogma that it was meant to rebut.

It bears emphasizing that the Court is not engaged in—and has been careful to avoid—questioning the validity of Cavanaugh's beliefs. The Court is well aware that it "should not undertake to dissect religious beliefs because the believer admits that he is struggling with his position or because his beliefs are not articulated with clarity and precision that a more sophisticated person might employ." *United States v. Ali*, 682 F.3d 705, 710 (8th Cir. 2012) (quoting *Love*, 216 F.3d at 688) (citations and quotations omitted). It is worth noting, however, that aside from identifying the FSM Gospel, Cavanaugh has not alleged anything about what it is that he actually believes—leaving the Court to read the book. And it is no more tenable to read the FSM Gospel as proselytizing for supernatural spaghetti than to read Jonathan Swift's "Modest Proposal" as advocating cannibalism. *Compare* Jonathan Swift, *A Modest Proposal*, *in Ireland in the Days of Dean Swift* 193, 194-203 (J. Bowles Daly ed., 1887) (1729).

This is not a question of theology: it is a matter of basic reading comprehension. The FSM Gospel is plainly a work of satire, meant to entertain while making a pointed political statement. To read it as religious doctrine would be little different from grounding a "religious exercise" on any other work of fiction. A prisoner could just as easily read the works of Vonnegut or Heinlein and claim it as his holy book, and demand accommodation of Bokononism or the Church of All Worlds.[6] *See*, Kurt Vonnegut, *Cat's Cradle* (Dell Publishing 1988) (1963); Robert A. Heinlein, *Stranger in a Strange Land* (Putnam Publ'g Grp. 1961). Of course, there are those who contend—and Cavanaugh is probably among them—that the Bible or the Koran are just as fictional as those books. It is not always an easy line to draw. But there must be a line beyond which a practice is not "religious" simply because a plaintiff labels it as such. The Court concludes that FSMism is on the far side of that line.

Because FSMism is not a "religion" for RLUIPA purposes, Cavanaugh has failed to allege a "religious exercise" was burdened.

### (b) Substantial Burden

A prisoner also bears the burden, under RLUIPA, of establishing that a government practice puts a "substantial burden" on his exercise of a religious

---

[6] Not that such a thing would be impossible: Heinlein's fictional church, at least, inspired foundation of a pagan church of the same name. *See* Church of All Worlds, http://www.caw.org (last visited Apr. 9, 2016). But Cavanaugh does not allege allegiance to any comparable organization—he simply relies on the FSM Gospel, taken at face value.

practice. *Holt*, 135 S. Ct. at 862; *Native Am. Council*, 750 F.3d at 749; *Van Wyhe*, 581 F.3d at 657; *Singson v. Norris*, 553 F.3d 660, 662 (8th Cir. 2009). Under the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*,

> [i]n order for a government practice to substantially burden a religious exercise, it must significantly inhibit or constrain conduct or expression that manifests some central tenet of a person's individual religious beliefs; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion.

*Native Am. Council*, 750 F.3d at 749 (citations and quotation omitted). But although this definition may be applied in the RLUIPA context, the Court must be mindful that RLUIPA's broad protection of "religious exercise" may protect beliefs that are not be "central" or "fundamental" to the prisoner's faith because RLUIPA extends even to religious practices are not "compelled by, or central to" a certain belief system. *Van Wyhe*, 581 F.3d at 656; *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 814 n.7 (8th Cir. 2008).

The primary focus of Cavanaugh's complaint, however, is that he is being discriminated against—that FSMism is not being treated the same as other faiths. He says very little about how his exercise of FSMism has been significantly burdened by that alleged discrimination. The closest he comes is alleging that the "wearing of special religious clothing is particularly important in FSMism" because, according to Cavanaugh, the FSM Gospel says that the Flying Spaghetti Monster "becomes angry if we don't." Filing 1 at 8-9. Cavanaugh does not, however, identify that religious clothing: a pirate costume. FSM Gospel at xiii. The passage relied upon by Cavanaugh originally comes from Bobby Henderson's initial letter to the Kansas Board of Education, found between a claim that scientific measurements are skewed by the Flying Spaghetti Monster "changing the results with His Noodly Appendage" and correlative data suggesting that global warming is caused by the decreasing number of pirates on the high seas. FSM Gospel at 108-09. The FSM Gospel states:

> I'm sure you now realize how important it is that your students are taught this alternate theory. It is absolutely imperative that they realize that observable evidence is at the discretion of the Flying Spaghetti Monster.
>
> Furthermore, it is disrespectful to teach our beliefs without wearing His chosen outfit, which of course is full Pirate regalia. I

> cannot stress the importance of this enough, and unfortunately cannot describe in detail why this must be done as I fear this letter is already becoming too long. The concise explanation is that He becomes angry if we don't.

FSM Gospel at 112. So, this began as an attempt to vex the Kansas Board of Education by demanding, not only that students be taught about a Flying Spaghetti Monster, but that teachers dress as pirates to do so. In other words, it is a joke, at the expense of proponents of intelligent design.

Cavanaugh's contention seems to be that denying him a pirate outfit prevents him from evangelizing about FSMism.[7] But it is not clear to the Court how such a limitation significantly burdens *Cavanaugh's* practice of his "religion," as opposed to constraining his ability to preach to others. Cavanaugh does not specifically identify the other "religious" practices he seeks; they would presumably include such things as grog, a parrot, a seaworthy vessel, a "Colander of Goodness," and to take off every Friday as a "religious holiday." *See id.* at 67-68, 74, 110, 124-25, 170. But even if denying those accommodations would make it more difficult for Cavanaugh to practice FSMism, it would not make him effectively unable to do so, or coerce him into acting contrary to his beliefs. *See, Kaufman v. Pugh,* 733 F.3d 692, 699 (7th Cir. 2013); *Lagar v. Tegels,* 94 F. Supp. 3d 998, 1008-09 (W.D. Wisc. 2015); *LaPlante v. Mass. Dep't of Corrs.,* 89 F. Supp. 3d 235, 251 (D. Mass. 2015); *see also Oklevueha Native Am. Church v. Lynch,* No. 14-15143, slip op. at 11 (9th Cir. Apr. 6, 2016). A "burden" is not enough—that burden must be "substantial." *See Van Wyhe,* 581 F.3d at 657. And even at the pleading stage, the Court finds that Cavanaugh has not alleged sufficient facts to suggest that his ability to practice FSMism—whatever that means—is *substantially* burdened. *See, Williams v. City of St. Louis,* 626 F. App'x 197, 198-99 (8th Cir. 2015); *Sanchez v. Earls,* 534 F. App'x 577, 578-79 (8th Cir. 2013). His claims are simply not facially plausible. *See Iqbal,* 556 U.S. at 678.

### (c) Immunity Defenses

Because Cavanaugh has alleged neither a "religious" exercise, nor a "substantial burden" upon it, his RLUIPA claim will be dismissed. However,

---

[7] Although the Court does not ultimately address whether Cavanaugh's beliefs are sincere, it bears noting that his pleading strategy is not entirely consistent with authentic religious convictions. Cavanaugh's claims, as will be seen below, hinge primarily on his desire to proselytize his purported faith, and yet in neither his complaint nor his briefing does he bring himself to explain even its most basic tenets. His vagueness looks less like inadvertent omission and more like an attempt to prevent the Court from recognizing FSMism for what it is.

it is still important to address how that claim affects each of the official- and individual-capacity defendants, in order to be clear about the grounds for each dismissal.

Cavanaugh's claims may only be asserted against the official-capacity defendants to the extent that Cavanaugh is seeking prospective injunctive relief. *See, Ex Parte Young*, 209 U.S. 123 (1908); *281 Care Comm. v. Arneson*, 638 F.3d 621, 632 (8th Cir. 2011); *Treleven v. Univ. of Minn.*, 73 F.3d 816, 819 (8th Cir. 1996). Under RLUIPA and § 1983, there is no cause of action for money damages against state officials acting in their official capacities. *Sossamon v. Texas*, 563 U.S. 277, 293 (2011); *Zajrael v. Harmon*, 677 F.3d 353, 355 (8th Cir. 2012). Therefore, Cavanaugh's claim for money damages against the defendants in their official capacities is barred by sovereign immunity. And obviously, because Cavanaugh failed to state a claim for relief, injunctive relief will not be forthcoming either.

The disposition of Cavanaugh's claims against the individual defendants is even clearer, because they are entitled to qualified immunity. Qualified immunity shields public officials performing discretionary functions from liability for conduct that does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Parker v. Chard*, 777 F.3d 977, 979 (8th Cir. 2015); *see, Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244 (2012); *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly, and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. *Pearson*, 555 U.S. at 231. It gives officials breathing room to make reasonable but mistaken judgments about open legal questions and protects all but the plainly incompetent or those who knowingly violate the law. *Parker*, 777 F.3d at 979-80.

In determining whether an official is entitled to qualified immunity, the Court asks (1) whether the facts alleged establish a violation of a constitutional or statutory right and (2) whether that right was clearly established at the time of the alleged violation, such that a reasonable official would have known that his actions were unlawful. *Johnson v. Phillips*, 664 F.3d 232, 236 (8th Cir. 2011); *see Parker*, 777 F.3d at 980. Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken. *Messerschmidt*, 132 S. Ct. at 1245; *Pearson*, 555 U.S. at 244. The protection of qualified immunity applies regardless of whether the official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact. *Messerschmidt*, 132 S. Ct. at 1245.

For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Parker*, 777 F.3d at 980. Clearly established law is not defined at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced. *Id.* Essentially, the law must be certain enough to give a "fair and clear warning." *Saylor v. Nebraska*, 812 F.3d 637, 643 (8th Cir. 2016) (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)). If a plaintiff can show relevant case law in the jurisdiction at the time of the incident that should have put the government employee on notice, qualified immunity is improper. *Id.* But to conclude that official conduct violates clearly established rights, the Court must find some factual correspondence with precedent, which requires a fact-intensive inquiry that must be undertaken in light of the specific context of the case. *Mountain Pure, LLC v. Roberts*, 814 F.3d 928, 935 (8th Cir. 2016).

The Court has little difficulty in finding that the defendants are entitled to qualified immunity in this case. The facts alleged in Cavanaugh's complaint are, to say the least, unique. Even if RLUIPA were to provide some protection to FSMism, the Court can find no authority that would have put the defendants on notice of that possibility. "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Luckert v. Dodge County*, 684 F.3d 808, 817 (8th Cir. 2012). A prisoner claiming accommodation for a religious parody is at worst a gray area, and nothing in the law clearly establishes the rights that Cavanaugh is claiming. In addition to lacking merit, Cavanaugh's RLUIPA claim against the individual-capacity defendants is barred by qualified immunity.

## 2. CONSTITUTIONAL CLAIMS

Cavanaugh's allegations also implicate the Free Exercise and Establishment Clauses of the First Amendment and the Equal Protection Clause. Filing 8. He also specifically raises certain provisions of the Nebraska constitution. Filing 1 at 4. Each of those claims is without merit.

## (a) First Amendment

To begin with, where an inmate has not met his burden under RLUIPA to demonstrate a substantial burden on his religious exercise, his claim fails under the Free Exercise Clause of the First Amendment as well. *Van Wyhe*, 581 F.3d at 657-58. And Cavanaugh lacks standing to raise an Establishment Clause claim. Such standing may be found where the plaintiff is a taxpayer—which Cavanaugh does not allege—or where the plaintiff alleges an injury of "direct and unwelcome personal contact with the alleged establishment of

religion." *Patel*, 515 F.3d at 816 (quotation omitted). Prisoners may establish an injury if they allege they altered their behavior and had direct, offensive, and alienating contact with a government-funded religious program. *Id.* at 817. Cavanaugh's complaint reflects only his "affirmative request that the prison accommodate his religious beliefs." *See id.* He does not allege that he altered his behavior or had direct, offensive, and alienating contact as a result of any accommodation given to another professed religion. *See id.* Absent an alleged injury, he does not have standing for an Establishment Clause claim. *See id.*

### (b) Equal Protection Clause

In order to establish an equal protection claim, a prisoner must show that he is treated differently from similarly situated inmates and that the different treatment is based upon either a suspect classification or a fundamental right. *Id.* at 815. Based on its discussion of FSMism above, the Court finds that Cavanaugh is not similarly situated to other inmates who profess a religious faith. And the allegations set forth in Cavanaugh's complaint to not suggest invidious discrimination: rather, they establish that prison officials considered Cavanaugh's request in good faith and concluded, reasonably, that FSMism was satirical and required no accommodation.

### (c) State Constitutional Claims

Cavanaugh's complaint also relies upon art. I, §§ 3 and 4 of the Nebraska constitution. But Nebraska law does not permit a direct cause of action for violation of a state constitutional provision. *See McKenna v. Julian*, 763 N.W.2d 384, 391 (Neb. 2009). And in any event, the relied-upon state constitutional provisions have been held to be coextensive with their federal counterparts. *See*, *In re Interest of Anaya*, 758 N.W.2d 10, 18-19 (Neb. 2008); *Citizens of Decatur for Equal Educ. v. Lyons-Decatur Sch. Dist.*, 739 N.W.2d 742, 762 (Neb. 2007); *see also State v. Bjorklund*, 604 N.W.2d 169, 221 (Neb. 2000), *abrogated on other grounds by State v. Mata*, 745 N.W.2d 229 (Neb. 2008). Cavanaugh's state constitutional claims will be dismissed as well.

### IV. CONCLUSION

The Court concludes Cavanaugh has failed to state a claim under RLUIPA or under the state or federal constitution that is plausible on its face. *See Iqbal,* 556 U.S. at 678. Specifically, he has failed to allege facts showing that the defendants have substantially burdened a religious exercise, or that the defendants' conduct violated his constitutional rights. And Cavanaugh's claims for money damages are barred by sovereign or qualified immunity. Cavanaugh's complaint will be dismissed.

The Court has considered whether Cavanaugh should be given leave to amend his complaint, but Cavanaugh has not requested such leave, and the Court's conclusion that FSMism is not a "religion" is, in the Court's view, an insuperable bar to relief for each of Cavanaugh's claims. Accordingly, the Court will enter a final judgment.

IT IS ORDERED:

1.    The defendants' motion to dismiss (filing 20) is granted.

2.    Cavanaugh's complaint is dismissed.

3.    Cavanaugh's motion for hearing (filing 38) is denied.

4.    A separate judgment will be entered.

Dated this 12th day of April, 2016.

BY THE COURT:

John M. Gerrard
United States District Judge